**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **LETICIA ISABEL VELARDE,** | ) | |
| | ) | |
| **Plaintiff/Petitioner,** | ) | |
| | ) | |
| **VS.** | ) | **Civil Action No.  SA-17-CA-792-XR** |
| | ) | |
| **JOHNATHAN ASHER GURGAN,** | ) | |
| | ) | |
| **Defendant/Respondent.** | ) | |
| | ) | |

## ORDER

On August 21, 2017, Petitioner Leticia Isabel Velarde filed a Verified Petition for Return of Child, requesting return of her son A.G. pursuant to the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (the "Hague Convention"), and the International Child Abduction Remedies Act ("ICARA").  Petitioner alleges that A.G. was wrongfully removed from his country of habitual residence (Mexico) in violation of her custody rights, and seeks a return order.  The Court conducted a bench trial on the merits of the Petition on October 4, 2017, and concludes that A.G. was wrongfully removed and that a return order is warranted.

## FACT FINDINGS AND CONCLUSIONS OF LAW

The Court issues the following findings of fact and conclusions of law pursuant to Rule 52. To the extent any finding of fact herein is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such.

## Findings of Fact

1. Petitioner Leticia Isabel Velarde was born in Laredo, Texas and is a United States citizen.  Her mother crossed the border to give birth and then returned to Mexico.  Petitioner grew up in Mexico and is also a Mexican citizen.  Her family resided in Nuevo Laredo, Mexico.

2. Respondent Johnathan Asher Gurgan is a United States citizen.

3. Petitioner came to the United States in 2002 for employment and stayed until 2013.

4. Petitioner Velarde and Respondent Gurgan met in 2005 and were married in Hays County, Texas on December 30, 2008.  The parties vacationed in Mexico before they were married.  Ex-6.

5. The couple spent Christmas 2011 in Veracruz with Petitioner's family. Ex-6.  They vacationed in Mexico after they were married.  Ex-7.

6. In early 2012, Petitioner and Respondent purchased undeveloped land in Canyon Lake, New Braunfels.  Respondent began constructing a home on the property, but it was never completed.

7. As early as February 2012, the couple discussed living in Mexico.  Ex-5 (Respondent states "I want to learn Spanish and live in VER with you").

8. On November 8, 2012, A.G. was born in New Braunfels, Comal County, Texas.  He is a United States citizen.  Petitioner testified that she believed he was also a Mexican citizen by virtue of his birth to a Mexican mother.

9. At the time of A.G.'s birth, Respondent was a factory distributor for Kirby Vacuum and was attending school at Austin Community College.   He obtained an associate's degree in business administration.  He planned to pursue a bachelor's degree and talked of eventually obtaining a commercial pilot's license.

10. At some point around 2012, Respondent was briefly hospitalized for fatigue and diagnosed by a doctor at UT Health Science Center with bipolar disorder, but he has not received treatment or taken medication related to this diagnosis.

11. In August 2013, Respondent enrolled in University of Texas San Antonio ("UTSA").  He testified that he needed a degree as a "check in the box" for a commercial pilot's license.

12. The family lived together in an apartment in New Braunfels from the time of A.G.'s birth in November 2012 until October 2013, when they moved together to Mexico.  During this time, they discussed moving to and living in Mexico.  Respondent and his mother both had a good relationship with Petitioner's family in Mexico.

13. Sometime in the year before their move to Mexico, the family voluntarily repossessed their Jeep.

14. Due to financial issues, the cheaper cost of living in Mexico, the desire to be near Petitioner's family in Mexico while being close to the university in Laredo, Texas, and possibly a desire to remove themselves from issues with Child Protective Services, Petitioner and Respondent jointly agreed to move the family to Mexico in October 2013. Although it is undisputed that the parents jointly agreed to move to Mexico, the duration of the planned move is disputed.

15. Respondent testified that, at the time of the move, he did not have the intent to abandon the United States to take permanent residence in Mexico. In contrast, Petitioner testified that they were "finally moving to Mexico" as they had talked about ever since they met, and her intention at the time of the move was not to return to the United States. She testified that they had visited often and always talked about living there, and when A.G. was born it seemed like the perfect opportunity for her to go back to her family and friends there with her son and husband. She testified that although they had talked about moving before then, she was enjoying her job, Respondent did not want to yet, and life did not present the opportunity.

16. The family moved to Nuevo Laredo, Tamaulipas Mexico in mid-October 2013. A.G. was 11 months old. They agreed that Petitioner would be a housewife and take care of A.G. and Respondent would go to school at Texas A&M International in Laredo, Texas. Nuevo Laredo, Mexico and Laredo, Texas are adjacent to each other, directly across the Mexican-United States border.

17. Petitioner agreed that they planned for Respondent to enroll in "international school" in Laredo, Texas, and that she supported that. She also testified that he discussed many things, including "opening businesses, continu[ing] school, going to pilot school, moving to different places in the world . . . always something different." She testified that some of his plans included businesses in Mexico, and that he was studying international business because he wanted to do business in Mexico. She agreed that he might have taken a job in Laredo, Texas, but said he would not have taken a job in Houston, Texas. Petitioner testified that they discussed Respondent's going to pilot school in Monterrey, Mexico because it was cheaper than in the United States. She agreed that the family's economic opportunities would be better if Respondent had U.S. employment, but she stated that he wanted to start his own business rather than be an employee. She also agreed that A.G.'s best opportunity could be in Texas and she would be okay with his crossing the border any time and would even consider having him attend school in Laredo, Texas. There was no specific testimony that, had Respondent taken a job in Laredo, the family would have moved back to Texas.

18. A few days after the move to Nuevo Laredo, Petitioner emailed numerous pictures of the Nuevo Laredo home to Respondent's mother, Jane Dahlke, and Dahlke responded, "Its so beautiful. Wow, what a nice home. You guys are going to be so happy there. Very nice. I'm excited. Jane." Ex-1.

19. Respondent "pretty much took all of his personal items with him" to Mexico, including documents, trophies, and childhood memorabilia, some of which had been in storage in New Braunfels or San Marcos. Ex-4. The family also brought their dog.

20. Respondent maintained his Texas cell phone number and testified that he maintained a "permanent address" at his mother's address in San Marcos, Texas. He received his VA benefits at that address. He filed U.S. tax returns. He maintained his bank account in San Marcos, Texas and opened one in Laredo, Texas. Respondent did not speak Spanish at the time of the move.

21. Petitioner paid Mexican taxes, got a Mexican driver's license, and opened a bank account in Mexico.

22. A.G. had a pediatrician in Mexico beginning at the time of the family's move there.

23. The family leased a home with a one-year lease in Petitioner's name. Respondent could not be on the lease because he was not a Mexican citizen. They furnished the home and lived there as a family. They spent time with Petitioner's family, including her sisters and mother. Because Petitioner was a housewife taking care of A.G., she and A.G. spent a lot of time with her family in Mexico, especially his two cousins who were close in age. The family vacationed in Mexico and spent Christmases there. Respondent's mother also visited the family in Mexico. There was no testimony or evidence that A.G. spent appreciable time in Texas after the move.

24. Respondent withdrew from UTSA without completing the fall semester. He enrolled in international economics at Texas A&M International in Laredo, Texas in January 2014. Respondent intended to get a bachelor's degree and eventually a commercial pilot's license. Respondent testified that he enrolled in school in the U.S. because he wanted to "earn dollars."

25. Respondent did not obtain a visa or other legal permission to reside in Mexico. He crossed the border to attend school. He never had a problem crossing the border.

26. Petitioner and Respondent did not take any official steps to obtain Mexican citizenship for A.G. Petitioner testified that she did not believe it was necessary because he would be a citizen by default by being born to a Mexican citizen. Petitioner also testified that Respondent did not require a visa to live in Mexico because he was married to a Mexican citizen, and his only restriction was that he could not "get a job."

27. Financially, the family lived on a combination of Respondent's VA benefits, student loans, and residual income from selling Kirby vacuums. His combined income was about $1500 to $2000 a month, and his mother also provided $300-$400 a month. Rent on the Nuevo Laredo home was $500 per month. It was a nice home, and Respondent testified that he could "get more bang for the buck" by living in Nuevo Laredo.

28. After the one-year lease on their home expired, the family remained in the home on a month-to-month basis for another year and four months.

29. Petitioner testified that she began working on her home-based natural soap and skin care product business in Nuevo Laredo in 2014, and registered her business in Mexico and began paying taxes

on it in 2015. Ex-15. A Mexican newspaper featured the business in May 2017. Ex-16.

30. In 2015, Petitioner and Respondent sold the Canyon Lake property. They financed a deposit on a Riviera Maya property in Tulum, Mexico that was in Petitioner's name. Ex-3, Ex-9. Respondent could not recall whether any of the deposit funds came from the sale of the Canyon Lake property. Respondent sought out the Riviera Maya property and wanted to buy it. Respondent testified that it was intended as a business investment and vacation property.

31. Respondent's VA benefits were exhausted in November 2015. His Kirby vacuum residual income also ended in December 2015.

32. In December 2015, Respondent obtained his bachelor's degree from Texas A&M International in Laredo.

33. In January 2016, Respondent enrolled in graduate school at Texas A&M International in Laredo, Texas to obtain an MBA in international business, with a plan to graduate in December 2016. Respondent stated he believed he needed to save up money before going to pilot school and believed he would have a higher income potential with a graduate degree. He began attending career fairs and talking with potential employers in the United States, including the U.S. Army and Customs and Border Protection. He did not specify whether this employment would be in Laredo or elsewhere.

34. In February 2016, the family moved to another leased home in Nuevo Laredo, Oaxaca 3114. With Respondent's agreement, Petitioner signed a one-year lease.

35. At some time in early 2016, Respondent notified the seller of the Maya property that due to financial constraints, he would not be able to complete the purchase of the property.

36. By 2016, Respondent's religious views changed dramatically and became more intense, as did his general outlook on life. Ex-10, Ex-12. Petitioner testified that he became controlling of Petitioner. The marriage was strained.

37. In mid-2016, Petitioner started discussing the possibility of divorce with Respondent. Respondent was upset and was opposed to getting a divorce. Family members were aware of the discussions and the negotiations about the divorce, including conversations about sharing custody equally.

38. Petitioner testified that Respondent's attitude about staying in Mexico changed sometime after June 2016. She testified that her intent to stay in Mexico had not changed.

39. On October 30, 2016, Respondent took A.G. to an apartment in Laredo, Texas without Petitioner's knowledge. He told her he was taking A.G. to Laredo to shop. Petitioner learned about it and went to Laredo and stayed in the apartment with them to convince Respondent to return to Mexico. The next day, the family returned to Mexico. Shortly after that event, Petitioner exchanged

text messages with Respondent's mother, who stated "I thought you both agreed to trust each other and noone takes him. [Respondent] will not break that trust." Petitioner contends that the text messages from Respondent's family that he would not break his word or take A.G. indicates that they knew of his intent to have Mexico as his habitual residence.

40. On November 25, 2016, Petitioner filed for divorce in Mexico (3rd Judicial District of Nuevo Laredo, Tamaulipas, Mexico).

41. On November 30, 2016, Respondent said he was taking A.G. to the park but instead took the child to San Marcos, Hays County to the residence of his mother. Respondent testified that, at the time he took A.G., he thought Petitioner might have filed for divorce. A.G. was four years old and had been living in Mexico with his parents continuously since he was 11 months old.

42. Before taking A.G. to San Marcos, Respondent researched the requirements of the Hague Convention, and he left some of his research and notes behind in Mexico. Next to the sentence "Therefore, failing to consider shared parental intent could potentially cause the court to overlook whether a parent is acting unilaterally to alter what had been previously agreed to by both parents," which Respondent partially underlined, Respondent wrote, "we had agreed to stay in Mexico if possible from an employment perspective but I knew that Letty would not want to return. I didn't either except for the divorce idea." Ex-13. Also in the margin he had written "this is our house"; "1 yr lease"; "intention." *Id.*

43. At the time Respondent took A.G. to San Marcos, he had not completed his studies at Texas A&M in Laredo, Texas. The distance between San Marcos, Texas and Laredo, Texas is 205 miles (approximately 3 hours by car).

44. On December 5, 2016, Respondent filed a suit for possession and custody in 22nd District Court, Hays County. Ex-14. He stated that he did not want a divorce.

45. On December 8, 2016, the Nuevo Laredo Attorney General began an investigatory proceeding.

46. On December 16, 2016, Mexico issued an arrest warrant for Respondent.

47. On July 13, 2017, the Mexican court issued a divorce decree.

48. On August 21, 2017, this proceeding was filed.

## Conclusions of Law

1. This case arises under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 24, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11. The Convention seeks "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are

effectively respected in the other Contracting States." Art. 1, Treat Doc., at 7.

2. The Convention provides that a child removed in violation of "rights of custody" must be returned to the child's country of habitual residence, unless certain exceptions apply. *Abbott v. Abbott*, 560 U.S. 1 (2010). The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence. *Id.* at 19. Ordering a return remedy does not alter the existing allocation of custody rights, but does allow the courts of the home country to decide what is in the child's best interests. *Id.*

3. Article 3 of the Convention states: The removal or the retention of the child is to be considered wrongful where–

> *a* it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

> *b* at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

4. Article 5 of the Convention states that for the purposes of the Convention, "rights of custody" shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.

5. Article 12 of the Convention states: Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

6. The United States has implemented the Convention through the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011. *Abbott*, 560 U.S. at 5. The statute authorizes a person who seeks a child's return to file a petition in state or federal court and instructs that the court "shall decide the case in accordance with the Convention." *Id.* (citing 22 U.S.C. §§ 9003(a), (b), (d)). If the child in question has been "wrongfully removed or retained within the meaning of the Convention," the child shall be "promptly returned," unless an exception is applicable. *Id.* (citing § 9001(a)(4)).

7. To establish her claim for wrongful removal, Petitioner must prove the following elements by a preponderance of the evidence: (1) Respondent removed or retained the child somewhere other than the child's habitual residence; (2) the removal or retention violated Petitioner's rights of custody under the habitual residence nation's laws; and (3) at the time of removal or retention, those rights were actually being exercised, either jointly or alone, or would have been so exercised but for the removal or retention. *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012).

8. "Habitual residence" is not defined in the Hague Convention, and determination of a child's habitual residence "is a fact intensive-determination that necessarily varies with the circumstances of each case." *Larbie*, 690 F.3d at 310. Determination of habitual residence presents a mixed question of law and fact. *Id.* at 306. To determine the child's habitual residence at the time immediately prior to removal, the Fifth Circuit has joined the majority of circuits that "have adopted an approach that begins with the parents' shared intent or settled purpose regarding their child's residence." *Id.* at 310. This is called the last shared intent approach. "[T]he threshold test is whether both parents intended for the child to 'abandon the [habitual residence] left behind." *Larbie*, 690 F.3d at 310-11 (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001)). Absent shared intent, "prior habitual residence should be deemed supplanted only where 'the objective facts point unequivocally' to this conclusion." *Id.*

9. "Much of the existing case law discussing a child's habitual residence involves situations where the parents were still together at the time of the child's birth, made plans for the child's future, and only later did the family unit begin to dissolve. In these situations, the court's task is usually to try to determine when the parents last had a shared plan regarding their child's future, and what that plan entailed." *Berezowsky v. Ojeda*, 765 F.3d 456, 468 (5th Cir. 2014). A shared parental intent requires that the parents actually share or jointly develop the intention; the parents must reach some sort of meeting of the minds regarding the child's habitual residence, so that they are making the decision together. *Id.*

10. A child is "wrongfully removed" if he was removed in violation of a right of custody. *Abbott*, 560 U.S. at 9. The Convention does not require any sort of formal custody order or private legal agreement, as rights of custody may exist by operation of law. Where no formal custody agreement exists, courts must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had "rights of custody" within the meaning of the Convention. *Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004). The Convention recognizes that custody rights can be decreed jointly or alone, and defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.* The phrase "place of residence" encompasses the child's country of residence. *Abbott*, 560 U.S. at 11. Thus, the right to choose the child's country of residence is a right "relating to the care of the person of the child" and is a right of custody. *Id.* The Convention protects rights of custody when "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Id.*

11. When the country of habitual residence has more than one territorial unit, the habitual residence refers to the particular territorial unit in which the child was resident, and the applicable laws are those in effect in that territorial unit. Convention, Art. 31. The Court has taken judicial notice of the relevant foreign law as permitted by Article 14 of the Convention. In addition, Petitioner has provided the Affidavit of Mariano Nuñez Arreola, an attorney licensed to practice in Mexico. Ex-18. Mexican choice-of-law rules require that Mexico apply the law of the Mexican State in which the child was habitually resident prior to the child's removal. *Whallon v. Lynn*, 230 F.3d 450, 456 n.6 (1st Cir. 2000). Arreola's affidavit also asserts that the Mexican Federal Civil Code and the Civil

Code of Tamaulipas should be applied if the child is determined to have been habitually resident in Tamaulipas. He states that the Tamalaupis Family Code is consistent with the laws of most of the states of Mexico regarding custodial rights of parents in that Tamaulipas Civil Code Article 383 provides that each parent has parental authority and responsibility, or *patria postestad*, with respect to their child, and Article 382 provides that parental authority/responsibility is exercised over children. He states that, in the Mexican state of Tamaulipas, parents of legitimate children presumptively exercise their authority/responsibility, or *patria potestas*, jointly. The Court finds that the Civil Code of the State of Tamaulipas, Mexico Articles 386 and 387, recognizes the doctrine of *patria potestas*. Pursuant to that doctrine, both parents have joint custody rights, and these are "rights of custody" under the Hague Convention. *Garcia v. Pinelo*, 808 F.3d 1158,1167 (7th Cir. 2015); *Mota v. Castillo*, 692 F.3d 108, 116-17 (2d Cir. 2012); *Gallardo v. Orozco*, 954 F. Supp. 2d 555, 573 (W.D. Tex. 2013); *Castro v. Martinez*, 872 F. Supp. 2d 546, 554-55 (W.D. Tex. 2012).

12. Even if the child has been wrongfully removed, a return order is not automatic. Return is not required if the abducting parent can establish that a Convention exception applies. *Abbott*, 560 U.S. at 22. Article 13 of the Convention provides that the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body who opposes its return establishes that (1) Petitioner was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or (2) there is a grave risk that his return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. *Larbie*, 690 F.3d at 308. The judicial authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views. None of these exceptions apply in this case.

13. The United States and Mexico are both Contracting States to the Hague Convention, and the child at issue is under 16 years old. This Court has jurisdiction and the Hague Convention applies to this dispute because the child was removed from a country that is a contracting state, Mexico, the child is under age 16, the child is located in this federal district, and the child is not the subject of any other Hague proceeding

14. Immediately prior to the removal in November 2016, A.G. was habitually resident in Mexico.

15. The child was wrongfully removed from his country of habitual residence, Mexico.

16. The removal was in violation of Petitioner's rights of custody under Mexican law.

17. Prior to the removal, Petitioner was actually exercising her right of custody. Respondent "agrees that prior to him and the child leaving Mexico both parties were exercising custody." Answer ¶ 9.

18. No exceptions apply, and therefore a return order is required.

### Analysis of habitual residence issue

The only real dispute in this case is whether Mexico or the United States was the country of A.G.'s habitual residence immediately prior to the removal in November 2016. Unfortunately, though "'habitual residence' is the central – often outcome-determinative – concept on which the entire system is founded," cases reach apparently conflicting results and there remains "interpretive variability" among circuit courts. *Mozes v. Mozes*, 239 F.3d 1067, 1072 (9th Cir. 2001); *Headifen v. Harker*, 549 F. App'x 300, 300 (5th Cir. 2013).

Petitioner contends that the parties agreed to move to Mexico permanently, and that Respondent unilaterally changed his mind in 2016 when his behavior and religious views changed and Petitioner began discussing a possible divorce. Second Am. Compl. ¶ 3 ("In October of 2013, the parties made a permanent move to Nuevo Laredo, Mexico . . . ."). Respondent contends that he and Petitioner never agreed to move to Mexico permanently, but only for a limited duration while Respondent completed his education, and that A.G.'s country of habitual residence has always remained the United States. Answer ¶¶ 1, 4 ("Respondent asserts that the move to Nuevo Laredo was temporary as Respondent continued his education in Laredo, Texas."), ¶¶ 6, 11, 12.

For Petitioner to succeed, she must first "show that the respondent removed or retained the child somewhere other than the child's habitual residence." *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012). Although the term "habitual residence" appears throughout the various Hague Conventions, none of them defines it. *Id.* at 310. The inquiry is not formulaic; rather it is a fact-intensive determination that necessarily varies with the circumstances of each case. *Id.* "At core, however, the inquiry balances the interests of the child, who is the ultimate focus of the Convention, and the intentions of its parents, who usually effect the removal or retention giving rise to a

Convention petition." *Id.*

In 2012, the Fifth Circuit "join[ed] the majority of circuits that 'have adopted an approach that begins with the parents' shared intent or settled purpose regarding their child's residence.'" *Id.* "This approach does not ignore the child's experience, but rather gives greater weight to the parents' subjective intentions relative to the child's age" and "parents' intentions should be dispositive where . . . the child is so young that 'he or she cannot possibly decide the issue of residency." *Id.* In such cases, "the threshold test is whether both parents intended for the child to 'abandon the [habitual residence] left behind." *Id.* at 310-11. Absent shared intent, prior habitual residence should be deemed supplanted only where the objective facts point unequivocally to this conclusion. *Id.* at 311. Context, rather than specific periods of time spent in one location or another, is key. *Berezowsky v. Ojeda*, 765 F.3d 456, 467 (5th Cir. 2014).

**A. <u>Mozes v. Mozes</u>, 239 F.3d 1067 (9th Cir. 2001)**

The Fifth Circuit has often favorably cited the Ninth Circuit's lengthy and thorough discussion of habitual residence in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001).[1] The *Mozes* court divided the cases on habitual residence into three broad categories.

*Mozes* first category:

> On one side are cases where the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move. Most commonly, this occurs when both parents and the child translocate under circumstances suggesting that they intend to make their home in the new country. When courts find that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared intent and settled purpose.

---

[1] *Cartes v. Phillips*, 865 F.3d 277, 283 (5th Cir. 2017) (noting that the Fifth Circuit frequently cites *Mozes* "with favor").

*Mozes*, 239 F.3d at 1077. The United States cases in this category were *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995); *Walton v. Walton*, 925 F. Supp. 453, 457 (S.D. Miss. 1996); *Prevot v. Prevot*, 855 F. Supp. 915, 920 (W.D. Tenn. 1994), *overruled on other grounds*, 59 F.3d 556 (6th Cir. 1995); and *Harsacky v. Harsacky*, 930 S.W.2d 410, 415 (Ky. Ct. App. 1996).

In *Feder*, the child was born in Germany to American parents and the family moved to Pennsylvania when the child was about three months old. When the child was three and a half, the family from the United States to Australia "where [the child] was to live for at the very least the foreseeable future, and stayed in Australia for close to six months, a significant period of time for a four-year old child." *Feder*, 63 F.3d at 224. The father was enthusiastic about the move, but the mother was reluctant and had misgivings about the couple's deteriorating marital relationship. Nevertheless, the mother decided in favor of keeping the family together and agreed to the move, intending to work toward salvaging her marriage.

The court noted that the child attended preschool and was enrolled in kindergarten for the upcoming year, participating in one of the most central activities in a child's life. *Id.* It further noted that "[a]lthough Mr. and Mrs. Feder viewed Australia very differently, both agreed to move to that country and live there with one another and their son, and did what parents intent on making a new home for themselves and their child do – they purchased and renovated a house, pursued interests and employment, and arranged for [the child's] immediate and long-term schooling." *Id.* That the mother did not intend to remain in Australia permanently and believed that she would leave if her marriage did not improve did not "void the couple's settled purpose to live as a family in the place where Mr. Feder had found work." *Id.* In finding that Australia was the child's habitual residence, the Third Circuit defined habitual residence as "the place where [the child] has been physically

present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective"; it also held that "a determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." *Id.*[2]

In *Walton v. Walton*, the facts were similar to *Feder*.  The family moved from Texas to Australia when the child was almost three years old.  The father wanted the move and the mother did not because the couple was having marital difficulties, but she decided to go with him.  The family leased a house in Australia and enrolled the children in school and day care; they vacationed together in Australia; the family attended church together in Australia and the child had playmates there; and the parents held a joint banking account in Australia.  The parents eventually sought divorce and, while the divorce proceedings were pending, the mother took the child back to the United States (Mississippi) without the father's consent after living in Australia for about one and a half years.

The district court noted the lack of a clear standard, but noted that the Sixth Circuit had stated to focus on the child, not the parents, and examine past experience, not future intentions, and that "on its face, habitual residence pertains to customary residence prior to the removal" looking back

---

[2] At the time it issued *Feder*, the Third Circuit did not focus heavily on shared parental intention or necessarily consider an intent to abandon the prior habitual residence.  However, it found that both parents agreed to the child's presence in Australia and noted that they had sold their house in the United States, purchased and renovated a house in Australia, and moved their furniture.  The father changed his driver's license and completed paperwork to obtain permanent residency for the entire family, while the mother did not surrender her Pennsylvania license nor submit to the physical exam or sign the papers required of those seeking permanent residency status.  The mother then decided to leave her husband and return to the United States with the child about six months after the family had moved to Australia.

in time, not forward. *Walton*, 925 F. Supp. at 457 (citing *Friedrich v. Friedrich*, 983 F.2d 1396 (6th Cir. 1993)). The district court found that the family's life in Australia had a settled purpose, that the child had never resided in Mississippi, and that no evidence would justify a finding that Texas was the child's state of habitual residence, requiring the conclusion that Australia was the state of habitual residence before her removal. *Walton*, 925 F. Supp. at 457-58.

In *Prevot*, 855 F. Supp. 915 (W.D. Tenn. 1994), the mother was an American citizen and the father a French citizen, and the child was born in Tennessee. According to the mother, the father wanted to return to France to escape certain obligations for criminal restitution and back taxes, and the court found that, "for whatever reason, the decision was ultimately made to move to France." The family moved to France with their two children, the oldest of whom was only two. The parents opened a restaurant, and the older child was enrolled in a local school while the younger child stayed home. The parents then began having marital difficulties, and the mother first announced her desire to return to the United States after almost two years in France; she then took the children back to the United States without the father's knowledge or consent after living in France for just over two years.

The court followed *Friedrich* and found that the children were habitual residents of France when they were removed, noting that the parents made the conscious decision to relocate in France, and the family lived there for more than two years before the mother brought them back to the United States. The children had acclimated to France and the family established a business with the full intent that France was to be their permanent home, and it was only after the parties began experiencing marital difficulties that the mother's plans changed.

In *Harsacky v. Harsacky*, 930 S.W.2d 410 (Ky. App. 1996), the mother was a native of Finland the father a citizen of the United States, and the children were born in California. When the

children were under the age of two, the family moved to Kentucky for two months, and then to Finland, where they remained for almost three years. The parties then moved back to the United States—the father stated the move was permanent, while the mother stated it was a vacation or a stay of indefinite duration. They leased their house in Finland and sold many items, including their cars and furniture, and brought their personal items and clothing to the United States, at considerable expense. Given the type of property they sold in Finland and brought to the United States, the court was "persuaded that the parties intended to relocate to the United States on an indefinite basis, if not permanently." *Id.* at 412. In the United States, they leased apartments, purchased automobiles, and sought employment. Although the mother denied any intention to live permanently in the United States, she acknowledged that they may have stayed for as long as a year if her husband was able to find employment.

The court found "that the parties intended to live in this country on an indefinite basis and that they brought their children here for that purpose." *Id.* After about a month in Texas, the parents had a violent domestic dispute, and the father took the children to Kentucky, and a couple of months later, the mother filed a Hague petition asserting that the children should be returned to Finland. The court rejected the mother's contention that Finland was the children's country of habitual residence, reasoning that "the Court must ask whether the parent intended or agreed that the jurisdiction would be home to the child, if only for an indefinite period." *Id.* at 414. The Court rejected the mother's argument that she had previously decided to return with the children to Finland, noting that the habitual residence determination must focus on the child, not the parents, and examine past experience, not future intentions. *Id.*

*Mozes* second category:

Discussing a second category of cases, the *Mozes* court noted that "[o]n the other side are cases where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period. In these cases, courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Mozes*, 239 F.3d at 1077. The cases cited in footnote 27 are illuminating about what the court viewed as specific, delimited periods:

> *See, e.g., Pesin v. Rodriguez*, 77 F. Supp. 2d 1277, 1285 (S.D. Fla. 1999) (settled purpose of family trip was a vacation of finite duration); *In re Morris*, 55 F.Supp.2d. 1156, 1159 (D. Colo. 1999) (when family left Colorado for 10-month teaching appointment in Switzerland, the parties had a "shared, settled intention to return to Colorado with the child," and mother's unilateral change of position could not make Switzerland the habitual residence); *Freier v. Freier*, 969 F. Supp. 436, 438 (E.D. Mich. 1996) (when mother left with child, she informed father that she would be vacationing with parents for one month); *Flores v. Contreras*, 981 S.W.2d 246, 248 (Tex. App. 1998) (mother brought child to Texas for two-week vacation); *Brennan v. Cibault*, 227 A.D.2d 965, 965, 643 N.Y.S.2d 780 (N.Y. App. Div. 1996) (mother agreed that child should remain with father in New York for six months, but expected her to return to France on a specific date).

*Mozes*, 239 F.3d at 1077 n.27. In *Pesin*, although the family was together, the purchase of round trip tickets and the fact that the parties had packed for only a temporary visit indicated that the parents' settled purpose was a family vacation of finite duration, and thus the court found that 23 days in Florida was insufficient to create a new habitual residence there. 77 F. Supp. 2d 1277, 1284-85 (S.D. Fla. 1999).

In *Morris*, the father was awarded a 10-month sabbatical leave and a one-term guest teaching appointment at a university in Switzerland. The parents sold their home prior to leaving Colorado with the intention of returning and purchasing a larger home, and stored their furniture

and other household items in Denver. The father signed a contract with his employer agreeing to resume his normal teaching position in Colorado upon his return, and the mother sent a letter to her Colorado employer stating that she desired to return to her position when she and the father returned to Colorado. At the time the parties left for Switzerland, the father fully intended to return to Colorado with his wife and children at the conclusion of the sabbatical and believed the mother also intended to return to Colorado to purchase a home and resume her employment. The mother testified that she did not have a fixed intent to return and stay in Colorado but was keeping opportunities open.

The court found that at the time the parties left Colorado for Switzerland, they had a shared, settled intention to return to Colorado with the child. 55 F. Supp. 2d 1156, 1159 (D. Colo. 1999). The court found "no dispute that the child's habitual residence was Colorado before the family went to Switzerland" and held that it remained there. *Id.* at 1161. The fact that the parents and the child were physically present in Switzerland for some period of time did not alone shift the habitual residence. *Id.* The court noted that the parents had lived in Switzerland only 104 days of the total 205 days away from Colorado, and the remainder was spent either living in Germany or vacationing elsewhere in Europe. *Id.* The court noted that "the duration of the residence in the contracting state is a factor for consideration" and where the duration "is intended to be indefinite, the habitual residence of a child is usually in that foreign country," whereas if the "stay is intended for a limited, distinct period of time, especially for less than one year, courts have been reluctant to find that a new habitual residence has been established." *Id.* The court found that the "parties' shared intention was to remain in Switzerland for a limited period of time defined by the Father's sabbatical leave." *Id.* at 1162. It noted that the parties resided in Switzerland for only four months,

and although they sold their home in Colorado, they intended to purchase a new and larger home upon their return, and that their intent was manifested by the fact that they stored their furniture and car in Colorado and the child traveled to Switzerland on a U.S. passport with a round-trip ticket. *Id.* The court did not find credible the mother's testimony that she intended to remain in Switzerland, given her ties to and family in Germany and statements she had made about her intent to move to Germany.

The court noted several sabbatical cases in which the parties arrived at the sabbatical location with a shared intent to return to their state of origin, but at some point during the sabbatical one of the parties changed his or her mind and expressed an intent to remain in the new state. Those courts found that the child's habitual residence remained in the state of origin, and the unilateral change in position of one parent was not sufficient to alter the parents' settled intention that their state of origin was to remain the habitual residence of the child during the sabbatical. *Id.* The court held that "in a sabbatical situation . . . in which a family intends to be in a foreign country for a defined period of time of less than one year and for a defined, specific purpose, a parent's unilaterally changed intent is not enough to shift the habitual residence of a minor child." *Id.*

In *Freier v. Freier*, 969 F. Supp. 436 (E.D. Mich. 1996), the child was born in Israel and lived there with the parents, but vacationed during the summers in Michigan with her mother at her parents' home. When the child was four, the mother took her to Michigan on July 1, ostensibly for vacation with return tickets on August 1. On July 17, the mother told the father she wanted a divorce and was not returning. The father then filed a Hague proceeding, arguing that the child's habitual residence was Israel, and the court agreed.

In *Flores v. Contreras*, 981 S.W.2d 246 (Tex. App.–San Antonio 1998, pet. denied), the

child was born in Mexico to a Mexican mother and American father, and lived with his mother in Mexico for 50 days until they came to San Antonio on a two-week visa. The mother asserted that she stayed until the father and his ex-wife forced her to leave without her child, while the father asserted that she came to marry him, changed her mind, and left the child with him willingly. The mother than filed a Hague proceeding, and the court found that the child's habitual residence was Mexico.

In *Brennan v. Cibault*, 643 N.Y.S.2d 780 (N.Y. App. Div. 1996), the child was born in France to an American father and French mother. The family lived in France for a year and four months, when the father and child "arrived in New York for a six-week visit with [the father's] mother." *Id.* at 781. The father had round-trip tickets and was expected to return in six weeks. The marriage had been troubled, and the parents then decided to separate and discussed sharing custody, with the child spending alternating six months with each of them. The mother offered the father the first six-month period, but informed him that she expected the child to return to France on a specific date at the end of that period. The father admitted having the discussions but denied specifically agreeing to that arrangement. The mother purchased round-trip tickets to collect the child in New York and return to France with her at the end of the six months. The father filed a custody suit and served the mother when she arrived in New York to pick up the child.

The appeals court found that the trial court erred in concluding that the child was not a habitual resident of France, noting that the term "refers to a 'degree of settled purpose,' as evidenced by the child's circumstances in that place and the shared intentions of the parents regarding their child's presence there." *Id.* at 782 (citing *Feder*, 63 F.3d at 224). The court found that the parents were married in France and had established professions and a home there, the child

was born there and lived there for the first 16 months of her life before she left for what was to be a six-week visit with her grandmother in New York, and these "facts reflect a settled purpose on the part of the parties to establish [the child's] life in France." *Id.*

*Mozes* third category:

The Ninth Circuit noted a third "in between" category "where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration" and "[s]ometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely." *Mozes*, 239 F.3d at 1077. "When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence." *Id.* The cases cited here are *Falls v. Downie*, 871 F. Supp. 100, 101 (D. Mass. 1994) ("Falls understood when Downie left with Patrick that he and their child would be staying in the United States for an *indefinite* period of time."); *Slagenweit v. Slagenweit*, 841 F. Supp. 264, 269 (N.D. Iowa 1993) ("The parties mutually agreed that Sandra would remain in the custody of Steven for an indefinite period of time in Iowa."); *Levesque v. Levesque*, 816 F. Supp. 662, 667 (D. Kan. 1993) ("[W]hen Britta and Vallery returned to Germany . . . there was an intent to remain, at least for a period time which was indefinite. This was by mutual agreement."); *Schroeder v. Perez*, 664 N.E.2d 627, 632-33 (Ohio Comm. Pl. 1995) ("The parties had mutually agreed that Gabriela would remain in the custody of the plaintiff for an indefinite period in Ohio.").

In the cited cases, the family did not move as a unit, but both parents agreed that the child would remain with one parent in the new country for an indefinite period of time, and the courts found that this agreement was sufficient to establish the child's habitual residence in the new

country.

In *Slagenweit*, 841 F. Supp. 264, 269 (N.D. Iowa 1993), the mother voluntarily brought the child from Germany, her birthplace, to live with the father in Iowa in part to obtain medical treatment, though the parties disputed their intent concerning the child's custody at the time she was left. The court concluded that it was intended that the child remain with the father for an indefinite period of time, but "it was also the understanding of the parties that [the child] would eventually return to Germany" though no specific return date was set. *Id.* at 266. Later, a specific return date was set, but the child was not returned. The court found that Germany was no longer the child's place of habitual residence by the time of the alleged wrongful retention because the parties mutually agreed that she would remain in the custody of the father for an indefinite period of time in Iowa, there was a change in geography and a passage of time, and the child had become a habitual resident of Iowa by her substantial involvement with her father and his girlfriend, the other primary care giver, and the Iowa medical community. The court noted that the child "has very much become a resident of the Cedar Rapids community, with the consent of both parents, so that she could no longer be considered a habitual resident of Germany at the time of [the mother's] demand for her return." *Id.* at 269.

In *Levesque v. Levesque*, 816 F. Supp. 662 (D. Kan. 1993), the child was born in Germany in April 1989 and resided there until May 1991, when the mother and child moved to the United States and stayed with family, and then joined the father in Kansas. In April 1992, the mother and child returned to Germany for five weeks and then returned to Kansas. The mother stated that she returned to get her belongings with the plan to return to Germany with the child , and the father stated he believed they would only be gone for a short time. The mother and child returned to

Germany in June 1992, with the father's permission. The father went to Germany in July and then took the child back to the United States without the mother's consent. The court found that "both parents agreed that [the mother] would return to Germany for some period of time with [the child]," the "amount of time was left open and [the father] agreed [the child] should go with [the mother]"; and "[t]hese arrangements had been agreed to and 'amounted to a purpose with a sufficient degree of continuity to enable it properly to be described as settled.'" *Id.* at 666. The fact that, "by mutual agreement," when the mother and child returned to Germany, "there was an intent to remain, at least for a period of time which was indefinite" was sufficient to make Germany the country of habitual residence. *Id.* at 667.

In *Schroeder v. Perez*, 664 N.E.2d 627 (Ohio Comm. Pl. 1995), the child was born in Mexico to an American mother and Spanish father. The child was a citizen of the United States, Mexico, and Spain. When the child was about five months old, the family moved together to Spain. The court noted that although the parties had intended to make their home in Spain, for at least the time being, the mother had moved somewhat reluctantly, and later become discontented and left Madrid with the child for a six-week visit to Ohio with her family, purchasing a round-trip ticket, when the child was eight months old. The parents then discussed their marital problems and whether either parent would move. Eventually both parents filed for divorce, but continued having discussions about their marriage and their child. At no time did the father insist that the mother return to Spain with the child, and even told the mother that she could have custody as long as they could work out visitation once the child was old enough to travel. The father eventually told the mother he was in love with another woman and did not want her to return. The father did not participate in the hearing and the court therefore was "compelled to find that the child ha[d] not

been wrongfully retained in Ohio" because the mother left Spain with the father's permission and he knew where the child was and acquiesced in the mother's living in Ohio with the child and had not urged the plaintiff to return. The court found that "it was intended that [the child] remain with her mother in the United States for an indefinite period of time" and when the defendant became aware that the mother would not be returning with the child, "he raised no objection and indeed acquiesced in the plaintiff's remaining" in the U.S. *Id.* at 632.

Other times, the Ninth Circuit noted in *Mozes*, "circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment [of a prior habitual residence] can be inferred." *Mozes*, 239 F.3d at 1077. The cited cases include *Meredith v. Meredith*, 759 F. Supp. 1432, 1433 (D. Ariz. 1991) (petitioner suggested that respondent take children to France to visit her parents for an unspecified period); *Harkness v. Harkness*, 577 N.W.2d 116, 118-19 (Mich. App. 1998) (children were left with respondent's parents in Michigan for eight months while both parents were in Germany); *Re A*, [1995] 1 F.L.R. at 773 (mother's agreement that child should attend school in Pakistan for two years while living with father's relatives was "temporary and conditional" and not sufficient to change the child's habitual residence); *Re S and another*, [1994] 1 All E.R. at 241 (Engl. Fam. Div. 1993) (family moved from Israel to England, where parents each had one year teaching appointments, though it was not beyond the realms of possibility that they would have stayed longer).

**B. Analysis**

Petitioner places the facts of this case within the first *Mozes* category. She contends that the parties mutually agreed in October 2013 to move to Mexico permanently, though Respondent

planned to attend school just across the border in Laredo. She contends that Respondent then unilaterally changed his mind in 2016, after his behavior and religious views changed and she began discussing the possibility of divorce. Although Respondent contends that the family's move to Nuevo Laredo was intended to last only as long as he was in school and until he obtained employment in the United States, the court agrees that the preponderance of the evidence supports Petitioner's testimony that the move to Nuevo Laredo was intended to be permanent or at least indefinite, placing this case within the first or third *Mozes* category, both of which indicate a change in habitual residence to Mexico.

The Court's task is "to try to determine when the parents last had a shared plan regarding their child's future, and what that plan entailed." *Berezowsky v. Ojeda*, 765 F.3d 456, 468 (5th Cir. 2014). The Court finds that the parents mutually agreed in October 2013 to move to Mexico either permanently or at least for an indefinite duration, and that they made "a joint decision to raise the child in the new country." *Id.* at 471. The Court finds Petitioner's testimony that they planned to move there permanently (or at least indefinitely) credible and supported by the objective facts.

Petitioner was from Nuevo Laredo and her family was there. The couple often visited Mexico and vacationed there before the move, and they discussed living in Mexico together. Before the move, the family lived in an apartment in New Braunfels, which they abandoned when they moved to Nuevo Laredo. They took their belongings with them from the apartment and from storage, and they brought their dog. They also voluntarily repossessed their car. They leased a nice home in Nuevo Laredo, which they furnished, and sent pictures of the home to Respondent's mother. They remained in that home from October 2013 (when A.G. was 11 months old) to February 2016 (when A.G. was 3 years 2 months old), when they moved to another home in Mexico

and signed a one-year lease. All of these objective facts indicate an intent to abandon Texas as their habitual residence and to establish a new family residence in Mexico. Further, the objective evidence does not contradict Petitioner's testimony.

There is contrary testimony from Respondent, who testified that they intended to stay only until he finished his education, when presumably the family would move back to Texas or somewhere in the United States. Although he did not specify a length of time for him to finish his education, it appears that, at the time of the move, this was contemplated to be a minimum of two years for Respondent to finish his bachelor's degree. Respondent argues that the fact that he wanted to get a commercial pilot license and to "earn dollars" indicate an intent to move back to the United States when he finished his education. However, Petitioner testified that they discussed Respondent getting his pilot license in Mexico, and that Respondent also had many different ideas about pursuing opportunities in international business. Respondent could pursue these opportunities in either Texas or Mexico, or both simultaneously, and there is no indication that his doing so would require a change in the family's living situation, given Nuevo Laredo's proximity to Laredo, Texas. And, as noted, even if Respondent intended to obtain employment in the United States, Petitioner testified it might have been Laredo but not some place like Houston, and there was no specific testimony that if Respondent obtained employment in Laredo, Texas, the family would move back across the border.

Respondent also testified that he maintained a "permanent address" at his mother's in San Marcos. Using this address apparently made it easier for Respondent to receive his VA benefits. But neither Petitioner nor A.G. had ever resided at that address prior to Respondent's removal of A.G. in November 2016. The fact that Respondent unilaterally maintained ties with his mother's

address in San Marcos does not establish that either parent at any time intended that address to be A.G.'s future residence, nor does it show that they had a specific plan to move A.G. or the family back to Texas at the completion of Respondent's education.

Respondent also maintained his U.S. cell phone number and bank accounts, but those facts are not very persuasive given the close proximity of Laredo and Nuevo Laredo and the fact that Respondent was attending school in Laredo. Keeping U.S. bank accounts would facilitate receipt of Respondent's Kirby vacuum residual income and his student loans, as well as funds from his mother. In addition, cell phone numbers are highly portable and having a U.S. cell phone number would also facilitate Respondent's educational and international business pursuits. Thus, maintenance of these ties was more a matter of convenience and logistics than evidence of intent to maintain the child's habitual residence in the United States.

There is also evidence that the couple purchased land in New Braunfels in early 2012 and that Respondent was constructing a house there. However, Respondent never finished building the house (there was no testimony concerning when he began or ceased building). Moreover, the couple later mutually agreed to sell that property and bought property in Mexico.

Respondent's testimony that the family planned to return to Texas or the United States[3] upon

---

[3] Respondent's Answer generally contends that A.G.'s habitual residence "rests in the United States" and his trial brief argues that his "habitual residence rested in Texas." Notably, Respondent must argue that A.G.'s residence is the entire state of Texas because A.G. has no more specific geographic area that could be considered his habitual residence. The only place he ever lived in Texas was New Braunfels, but it is undisputed that the family left their apartment there and took all their belongings to Mexico, and that they sold the land in New Braunfels. Respondent testified that he maintained a "permanent residence" at his mother's in San Marcos, but it is undisputed that A.G. never lived there prior to Respondent's removal of A.G. from his home in Mexico. Thus, there is no specific place in Texas that could be considered A.G.'s "home" or residence from October 2013 to November 2016. This bolsters the conclusion that A.G.'s habitual residence was in Mexico, where his actual home was.

completion of his education is further contradicted by the fact that the family moved to a second home in Nuevo Laredo and signed a new one-year lease in February 2016 and by Petitioner's registering her business in Mexico in 2015.

Further, the Court finds Respondent's own handwritten notes on his Hague research to be highly persuasive that he shared Petitioner's desire and intent to remain in Mexico and that the parties mutually agreed to do so. He wrote that the Nuevo Laredo house "is our house" and, more importantly, "**we had agreed to stay in Mexico if possible** from an employment perspective but **I knew that Letty would not want to return. I didn't either except for the divorce idea**." Ex-13 (emphasis added). This is highly persuasive evidence that the couple had agreed for the family to stay in Mexico if possible rather than return to the United States upon completion of Respondent's education, and thus had agreed to abandon Texas (and the United States) as the family's habitual residence and to raise the child in Mexico. The Court finds that the parents had this intent in October 2013. In the alternative, the Court finds that even if the parents moved to Nuevo Laredo in October 2013 with the intent to remain only until Respondent finished his education, they had mutually agreed at least by 2015 to remain in Mexico if possible – by that time Petitioner had started her business and they had sold the Canyon Lake property and purchased property in Mexico. *See Cartes v. Phillips*, 865 F.3d 277, 283 (5th Cir. 2017) ("parents' shared intent about their child's habitual residence does not —and need not—always coincide with the child's initial change in location"). The handwritten notes are also persuasive evidence that Respondent's views unilaterally changed in 2016 once divorce was on the horizon.

Thus, the Court finds that the couple agreed to abandon Texas as the family's habitual residence and move to Mexico and make that the family's habitual residence, and that A.G. had

acclimatized there and acquired a new habitual residence, as the parents intended. Under such circumstances, courts have routinely held that one parent's unilateral change of heart is insufficient, and the child's country of habitual residence is where the parents had jointly agreed to raise the child— here, that country is Mexico.[4]

Although the Court concludes that its resolution of the facts compels a return order, it must address Respondent's contention that the facts of this case are more like the second *Mozes* category, where the child's initial translocation from an established habitual residence was intended to be of a specific, delimited period—the time it took for Respondent to finish his education at Texas A&M International. Respondent contends that the dispositive issue is whether the move to Nuevo Laredo was intended to be temporary or permanent, and if temporary, then the move did not amount to a change in habitual residence. Respondent argues as follows:

> *Larbie* teaches us that when a child's "initial move from an established habitual residence was clearly for a specific, limited duration," as was the case here, "most courts will find no change in habitual residence." 690 F.3d at 311; citing, *Whiting v. Krassner*, 391 F.3d 540, 549 (3d Cir. 2004).

It is true that *Larbie* so states. *Larbie*, 690 F.3d at 311.[5] In support of this statement, *Larbie* cites *Mozes* and *Whiting v. Krassner*, 391 F.3d 540, 549 (3d Cir. 2004).

---

[4] This case is like the Quebec Court of Appeal case, *Y.D.*, [1996] R.J.Q. at 2516, cited by the court in *Mozes*: Both parents had moved to California with their children and lived with them there continuously for three years, leaving behind no possessions in Canada. When the marriage deteriorated, one parent claimed that the stay had been intended to be temporary. The Ninth Circuit noted that there was little room for doubt that the children had become acclimatized in California, and that the same facts also support a finding that the couple had manifested a shared intent to abandon the family's prior habitual residence. The *Mozes* court in fact characterized that as an "easy case." *Mozes*, 239 F.3d at 1080.

[5] And *Mozes* and the cases cited therein and discussed above all predate *Larbie* and several other more recent Fifth Circuit cases in which the Court established and refined the shared parental intent standard. *E.g.*, *Berezowsky v. Ojeda*, 765 F.3d 456 (5th Cir. 2014); *Delgado v. Osuna*, 837 F.3d 571 (5th Cir. 2016); *Cartes v. Phillips*, 865 F.3d 277 (5th Cir. 2017).

The cases cited by *Mozes* in support of this statement are discussed above, and involved facts—such as a 23-day vacation, a one-month vacation, a six-week vacation, and a 10-month sabbatical—starkly different from the situation in this case.[6]  Moreover, the *Mozes* footnote concludes, "Some periods, on the other hand, though sharply delimited, may be too long to expect children to live abroad without acquiring habitual residence. *See, e.g., Toren v. Toren*, 26 F. Supp. 2d 240, 242 (D. Mass. 1998) (parents had written agreement under which children were to live and study in the United States for four years, after which they were to return to Israel)."  The *Mozes* court elsewhere stated, "If you've lived continuously in the same place for several years on end, for example, we would be hard-pressed to conclude that you had not abandoned any prior habitual residence."  *Mozes*, 239 F.3d at 1075.

Thus, *Mozes* indicates that its "category two" cases are properly limited to shorter time periods, typically less than a year, whereas Respondent's position is that the time period was dependent on his finishing his education, which was somewhat open-ended and appeared to be intended to be a minimum of two years at the time they moved to Mexico (and in fact turned out to be more than three years).  In addition, even if the initial move was intended to be for two or three years while Respondent finished his education, the Court has found that the parents mutually agreed by 2015 to remain in Mexico if possible.  Accordingly, *Mozes* does not support a conclusion that A.G.'s habitual residence remained in the United States.

In addition, as noted, the *Larbie* court cited *Whiting v. Krassner*, 391 F.3d 540 (3d Cir. 2004), with the parenthetical "holding that *a change in habitual residence had occurred* because

---

[6] Importantly, there was no evidence or finding of an intent to abandon the previous habitual residence.

the parents had a written agreement that the child should reside in Canada, not New York, at the time the petition was filed." (Emphasis added). In *Whiting*, it was undisputed that the parents had agreed for the child to live in Canada for a specific, limited duration of two years— this agreement was embodied in a written agreement and "specifically stated that [the mother] and [the child] would reside in Wallaceburg, Ontario, Canada, and [the child] would return to the United States no later than October 19, 2003, depending upon certain conditions." *Whiting*, 391 F.3d at 549. Thus, there was "a shared intent by [the child's] parents that she live in Canada for a period of two years" and the Third Circuit found this shared intent to "fulfill[] the requirement set out . . . in *Feder* that [the mother and child's] move to Canada was accompanied by a degree of settled purpose." *Id.* The court stated that "*Feder* requires only a degree of settled purpose to accompany the move, *even if such purpose is only for a limited time.*" *Id.* (emphasis added). Thus, whether the move was intended to be temporary or permanent was not the dispositive factor.

The *Whiting* court expressly rejected the father's argument that Canada could not be the child's place of habitual residence because there was never an intent to abandon New York as her habitual residence. In doing so, the court found "an intent to abandon New York for a definite and extended period in the life of an infant." *Id.* at 550. It continued,

> For the fact that [mother and child] were to return to the United States, subject to certain conditions, does not in any way diminish the parties' settled intention that the two were to remain in Canada for at least two years. Furthermore, the fact that the agreed-upon stay was of a limited duration in no way hinders the finding of a change in habitual residence. Rather, as we stated in *Feder*, the parties' settled purpose in moving may be for a limited period of time. Logic does not prevent us from finding that the shared intent of parents' to move their eighteen-month old daughter to Canada for two years could result in the abandonment of the daughter's prior place of habitual residence. Put more succinctly, in our view, the intent to abandon, need not be forever; rather intent to abandon a former place of residency of a one year old child for at least two years certainly can effectuate an abandonment

-30-

of that former habitual residence.

*Whiting*, 391 F.3d at 550. The Third Circuit retreated from its prior focus on "where [the child] has been physically present for an amount of time sufficient for acclimatization" to focusing on "the shared intent of the parents in determining the residence of their children." *Id.* The Court found that "[f]ocusing on the settled purpose to establish a habitual residence from the parents' perspective in the case of a young child not only provides us with a more workable framework in this context, but also furthers another objective of The Hague Convention the deterrence of child abduction." *Id.* at 551. The Court found it was "clear that Canada was [the child']s place of habitual residence immediately before she was taken by her father. For the shared intent of her parents, as clearly evidenced in the Agreement, was that she would remain in Canada for at least two years. It is clear that when [the father] removed [the child] from Canada and took her to the United States, his acts were disruptive of an agreed-upon intention." *Id.* at 551.

Even under Respondent's version of the parental intent as being that they mutually agreed that they would live in Mexico as a family only until he finished his education and then return to the United States, the reasoning of *Whiting* would appear to compel a conclusion that such intent was sufficient to change A.G.'s habitual residence to Mexico during that period of time and that Respondent's removal of A.G. from Mexico during that time period contravened the parents' settled intentions.

However, such a conclusion is complicated by *Headifen v. Harker*, 549 F. App'x 300 (5th Cir. 2013), in which the Fifth Circuit appears to focus the inquiry on whether the move was intended to be temporary or permanent. In that case, the child was born in Austin and adopted by Headifen, a New Zealand citizen, and Harker, a citizen of South Africa and the United States.

When the child was one, the family moved to New Zealand and lived together there for almost three years, when the parents separated. The mother claimed that the move was intended to be temporary, motivated in large part by the father's wish to be near his aging mother, and was expected to last no more than 12 to 18 months, with the intent to move back to Austin afterwards to raise the child in America. Due to financial constraints and marital strains, the family ended up staying longer, though the mother testified that the father still agreed to ultimately return the child to Austin by the end of the summer. The mother testified that the father then unilaterally changed his mind, prompting the mother to unilaterally return to Austin with the child in secret, "surreptitiously spiriting the child out of the country, and pilfering shared bank accounts while doing so," after the child had lived there for three and a half years. 1:13-CV-00340-SS, at 11 (W.D. Tex. June 7, 2013).

Despite acknowledging that this is "exactly the sort of behavior the Hague Convention seeks to prevent," the court found that the father had failed to establish New Zealand as the child's habitual residence. The court noted that the mother testified that the plan was always to return to Austin, and although the father testified the stay was intended to be of unlimited duration with no definite plan to return to Austin, he admitted on cross-examination that he had agreed to return to the United States. *Id.* at 11-12. The court found the mother to be more credible. *Id.* at 12. That both parents had agreed to return to Austin (both at the time of departure and later) was supported by emails and witness testimony. In addition, the court noted that the parents had enrolled the child in school in Austin and indicated an intent to return, the family leased their home in Austin instead of selling it (for only 18 months even though the renters wanted 24 because the family had intended to return after 18 months), both parents maintained numerous ties with the United States (including bank accounts, voting, and filing tax returns), and the father maintained his web-based business,

which he characterized as "an Austin company." Based on all the evidence, the court found that the parents never had a shared intention to make New Zealand the child's habitual residence, but intended to maintain Austin as the habitual residence. The court also found that the child was not integrated into the New Zealand setting or acclimated there.

On appeal, the Fifth Circuit affirmed in an unpublished opinion. *Headifen v. Harker*, 549 F. App'x 300 (5th Cir. 2013). The Court took "the opportunity to observe again that interpretive variability presently exists among circuit courts trying to apply the Convention" because of the lack of a definition of habitual residence. *Id.* The Court noted that if the removal was not from the child's habitual residence, then the Convention provides no relief even when a parent has unilaterally absconded with the child, and that the district court had found that "the adoptive mother absconded to Texas as the residence both parents had intended to return to after their temporary residence in New Zealand." *Id.* The court stated, "The fact-intensive discernment by the district court of this shared parental intent to return will generally be determinative, under *Larbie*, of a young child's habitual residence, hence will foreclose treaty relief against what otherwise may be a unilateral absconding with the child." *Id.* at 301. In a footnote, the court noted,

> Our reference to parents' intentions has value because it fixes a child's habitual residence for purposes of the Convention in the country where parents, prior to disunion, share a common purpose to reside permanently. For circumstances like those in *Larbie*, this primacy given to expressed intent about a permanent residence is compelling. *Larbie*, 690 F.3d at 298-99; *see also Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001). As we highlighted in *Larbie*, the mother acquiesced and consented to Texas-court authority over the parents' divorce and custody proceedings, and moved temporarily to the United Kingdom only while the father was deployed by the United States Air Force to Afghanistan. *Larbie*, 690 F.3d at 299. In the present case, however, the parents moved their family to New Zealand for several years, living together but later separating. In both cases, the child's overseas residence was intended to be temporary, not indefinite. That is the decisive point, more than that a change of habitual residence can be established only if parents intend to "abandon"

or "supplant" their originating country altogether. *See Mozes*, 239 F.3d at 1075.
*Headifen*, 549 F. App'x at 301 n.1.  This focus on whether the family's stay was intended to be temporary as "the decisive point" seems to be a retreat from *Larbie*'s and other cases' focus on whether the parents intended to abandon the prior habitual residence and is directly contrary to the Third Circuit's approach in *Whiting v. Krassner*, which found that parents could abandon the prior residence with an intent to establish a new country of habitual residence for a temporary period of two years.[7]

The *Mozes* court noted a habitual residence determination may yield strikingly different results depending on the observer's time frame.  *Mozes*, 239 F.3d at 1074 (the court also noted that Lord Scarman reasoned that for habitual residence to accrue, there must be a settled purpose, but "that is not to say that the propositus intends to stay where he is indefinitely; indeed his purpose, while settled, may be for a limited period").  Some courts have disavowed a focus on future intent. The Fifth Circuit has not clearly settled the issue of whether a complete, mutually agreed change in the family's residence, though intended to be temporary, would abandon the prior residence if the parents maintained an intent to return at some point.  The Fifth Circuit has made clear that the first step in acquiring a new habitual residence is forming a settled intention to abandon the one left behind.  *Larbie*, 690 F.3d at 310-11.  One must then ask, however: if one is intending to abandon the prior residence temporarily with an intent to return after a period of time, is one abandoning it? If the family lives in Texas and abandons it for Mexico, making Mexico the family home for two

---

[7] The *Mozes* opinion also notes that "[b]eing habitually resident in a place must mean that you are, in some sense, 'settled' there – but it need not mean that's where you plan to leave your bones." *Mozes*, 239 F.3d at 1074.  The Fifth Circuit cited this discussion with approval in *Berezowsky v. Ojeda*, 765 F.3d 456, 467 (5th Cir. 2014).

years, why should the result be different if the family intends to then move to England versus back to Texas? If this Court agreed with Respondent that the move was always intended to be limited to the number of years in which he finished his education, this case would fall into a gray area, and the Court would consider staying any return order pending appeal.

However, the Court does not agree with Respondent's version of the facts, and thus this case does not fall into that gray area. In this case, a preponderance of the evidence indicates that the family abandoned Texas and intended to and did make A.G.'s home in Mexico indefinitely or permanently. *Headifen* is factually distinguishable. The original move was intended to have a finite duration of no more than 18 months and though the family ended up staying longer, they continued to agree to return the child to the United States, where they had kept their home and enrolled the child in school. In this case, rather than finding an intent to move for a *maximum* amount of time, the Court has found that the initial move was intended to be permanent, or alternatively for a *minimum* of two years. The Court has further found that, at least by 2015, the parents had mutually agreed to stay in Mexico if possible, and there was no agreement to return to the United States at any specific time. The undisputed evidence is that the family abandoned the only "home" A.G. had had in Texas and there is no indication that anyone viewed him as having his habitual home in Texas from which he was temporarily absent while living in Nuevo Laredo. Rather, the evidence shows that the "two parents reached an agreement to raise [A.G.] in Mexico" permanently or indefinitely. *Berezowsky*, 765 F.3d at 471.

Because A.G.'s home in November 2016 was Mexico, and both parents intended it to be Mexico at that time, the Convention dictates that Mexico was his country of habitual residence and A.G. must be returned there. *Madrigal v. Tellez*, 848 F.3d 669, 673 (5th Cir. 2017) (the Convention

works to "restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court").

## RETURN ORDER

The Court ORDERS that the minor child A.G. be returned forthwith to the custody of Petitioner Leticia Velarde. As discussed at the evidentiary hearing, the Court ORDERS that Petitioner Velarde be allowed to retrieve A.G. from San Marcos as soon as she is able to do so, and Respondent shall cooperate fully in the return of the child.

The Clerk is directed to issue Judgment in accordance with this Order.

It is so ORDERED.

SIGNED this 13th day of October, 2017.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE